## SUPREME COURT.

### MARY D. WHITE agt. LYMAN WHITE.

The second section of the act of April 7, 1848, (Sess. Laws of 1848, p. 307,) which reads as follows: "The real and personal property, and the rents, issues and profits thereof, of any female now married, shall not be subject to the disposal of her husband, but shall be her sole and separate property as if she were a single female, except so far as the same may be liable for the debts of her husband heretofore contracted," declared *unconstitutional and void,* being in violation of the *first section of article one of the constitution of this state,* which reads as follows: "No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." It also contravenes the 6th section of article one of the constitution of this state, the last clause of which reads as follows: "No person shall be subject to be twice put in jeopardy for the same offence; nor shall be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation."

*Held,* that there is nothing in the constitution of the United States which invalidates this statute, for the reason that there is nothing prohibiting a state Legislature from taking away vested rights, unless they arise out of a contract; and as the marriage

relation is not created by what is understood to be a *contract* in the strictest common law sense of that term, and is not what in popular language and common parlance is understood by the word contract—the Legislature always having power to dissolve it—it is not a contract within the spirit and meaning of the prohibitory clause of art. 1, sec. 10, 1st sub. of the Constitution of the United States.

*September*, 1849.

R. Cooper, *for plaintiff.*

C. Field, *for defendant.*

This is a complaint filed by the plaintiff, who is the wife of the defendant, against her husband, to protect what she claims is her rights in relation to her real estate, and to restrain the defendant from interfering with the same. The complaint states that the plaintiff, as the heir-at-law of Richard Cary, succeeded to certain real estate as tenant in common with seven others of the children of the said Richard Cary, and that she the plaintiff married the defendant in 1819, and that there are six children now living, the issue of such marriage. That proceedings in chancery were taken to make partition among the children of the said Richard Cary of said lands, and that such proceedings were had. That on the 23d day of July, 1828, commissioners to make partition were appointed, who assigned and allotted to the plaintiff, as one of the heirs-at-law of the said Richard Cary, in the names of herself and the said defendant her husband, a certain farm known as lot No. 6, containing 100 acres, situated in the town of Springfield in the county of Otsego, and also several other farms on said tract, amounting in the aggregate to 470 acres, or thereabouts. That said commissioners made their report of partition, and the same was confirmed by the court on the 5th day of December, 1828, and a final decree of partition made; and that plaintiff moved on and took possession of said lot No. 6, assigned to the plaintiff as aforesaid; and from that time has continued to reside on and occupy said lot until within the last few weeks, during which time the plaintiff has been prevented from occupying said premises, and living in the dwelling house, by said defendant. The complaint sets forth, also, that since the said partition the defendant has had the management and control of the property, and has enjoyed the receipts, rents, issues and profits of the same. That the defendant is a man of idle habits, addicted to the use of spirituous liquor to such a degree as to become frequently intoxicated. That he has been careless and improvident in the management and cultivation of said farm, and greatly neglected the same; and that since the passage by the Legislature of this state of the law for the more effectual protection of the property of married women, the defendant has avowed to the plaintiff his determination

to exercise the exclusive control and direction of the said farm, and has prevented the plaintiff from having any power or control over the same, stating attempts by her to use and control the property, and the prevention by the defendant, and finally the entire expulsion of her from the house and premises, and this by personal force and violence, and a refusal of the defendant to permit her to return and live in the house or upon the premises, and an entire omission and refusal of the defendant to provide for her or her family, and an increase of the intemperate habits of the defendant, concluding with a prayer for the relief above stated; and to this complaint the defendant has interposed a demurrer, alleging as the grounds of demurrer,

1st. That the court has no jurisdiction and no power to grant relief.

2d. That the complaint does not state facts sufficient to constitute a cause of action, inasmuch as it appears from the complaint that the rights of the defendant to the property in question were vested rights, and claiming that the act of April 7th, 1848, enacted for the protection of the property of married women, cannot apply to the case.

MASON, Justice.—The second section of the act of April 7th, 1848, under which the plaintiff claims the possession of the property in this case, and that the defendant be restrained from interfering with the same, is as follows : " The real and personal property, and the rents, issues and profits thereof, of any female now married, shall not be subject to the disposal of her husband, but shall be her sole and separate property, as if she were a single female, except so far as the same may be liable for the debts of her husband heretofore contracted." It is true, courts incline against such a construction of the statute as would give it a retrospective action so as to take away a vested right. (7 Johns. R. 477.) But where the intention of the Legislature is apparent, it is the duty of the courts to see that the statute has its full effect, and is not eluded by construction. (15 Johns. R. 358.) I do not for a moment doubt that it was the intention of the Legislature in this statute, to give to the wife control over her real estate, and to sever the husband's rights to possess it. This, it seems to me, is most manifest from the plain reading of the statute itself. The husband, by marriage, does not become absolute proprietor of the wife's inheritance; but as the governor of the family, is so far master of it as to receive the profits of it during his life, but has no power to make an absolute sale of it without her consent. (Bacon's abridgment, Baron and Feme, letter C., 2d vol., page 15, Bouvier's ed.) This is an estate growing out of the marital relations, and is wholly dependent upon them. In the language of the common law, the husband becomes a tenant by the

courtesy, the title in fee remaining in the wife. This is one of the legal effects which the common law attaches as the effects of the marriage. The wife's legal existence and authority is in a degree lost or suspended, and the husband succeeds to the possession of her lands and takes the rents and profits *jure uxoris*, and if the wife dies before the husband without having issue, her heirs succeed to the estate. If, however, there has been a child of the marriage born alive, the husband takes the estate absolutely for life as tenant by the courtesy. (2 Kent's Com. 130, 131, 2d ed.) The only difficulty which I have encountered in this case to giving the plaintiff the relief sought by the complaint, arises from the doubts which have arisen in my mind as to the validity of the statute under consideration. There have been three considerations urged against the validity of this statute, and which we cannot avoid considering in this case, however grave or delicate the questions may be, and it would be but arrogance in me, did I not feel and confess my inability in the determination of questions of so grave magnitude. The determination of the questions raised in this case is a duty, however, from which we cannot be excused, however unpleasant the performance of it may be. The validity of this act of the Legislature must be faithfully examined and impartially determined. The first objection raised against the validity of this statute is, that the Legislature have transscended their authority as a state Legislature. In short, that this second section of the statute is in conflict with the constitution of the United States and consequently void; that it is a statute in conflict with that provision of the constitution of the United States which prohibits a state from passing any law impairing the obligation of a contract. The argument is that the relation of husband and wife is created by a contract of the parties, and is to be regarded as a mere civil contract between the parties. That by virtue of the contract of marriage between the parties in this case, the husband succeeded to all the plaintiff's personal property and to the rents and profits of her real estate during coverture at least, and that the statute under consideration takes away from the defendant in this suit these vested rights of property, and thereby assails and impairs the obligations of the marriage contract by taking away all these rights of property to which the husband succeeded under it. This question has not arisen in the courts of this state, and I am not aware of any adjudication of the question in any other states of the Union. I have looked carefully into the reports of the adjudication of the United States courts and do not find any adjudication of the questions by these tribunals. I am aware that in the case of *Dartmouth College* v. *Woodward*, 4th vol. U. S. Condensed Reports, 576 and

577, the late lamented Justice Story intimates the opinion that the contract of marriage is a contract within this prohibition of the constitution of the United States. To use his own language in that case, "If under faith of existing laws, a contract of marriage be duly solemnized, or a marriage settlement be made, (and a marriage in law is always a valuable consideration for a contract) it is not easy to perceive why a dissolution of its obligations, without any default or assent of the parties, may not as well fall within the prohibition as any other contract, for a valuable consideration. A man has just as good a right to his wife, as to the property acquired under the marriage contract. He has a legal right to her society and her fortune, and to divest such right without his default and against his will, would be as flagrant a violation of the principles of justice as the confiscation of his own estate. I leave this case, however, to be settled when it shall arise." (4 U. S. Condensed R. 577.) This language is obiter and has not, therefore, the weight of authority, however we might respect it as the opinion of a learned judge. I have bestowed the most deliberate consideration upon this branch of the case, and have come to a conclusion adverse to that intimated by the learned judge in the case above cited. At the time of the adoption of the constitution of the United States, the power of the state Legislature to control and modify the marriage relation, with all its incidents, was unquestioned, and the subject was considered peculiarly within the province of state legislation, and I cannot think that it was against any abuses of this right by state legislation that this constitutional provision was framed, and that it would, therefore, be a violent presumption to suppose that it was the intention of the framers of the national constitution to divest the states of their right to legislate upon this subject, and I apprehend that this is the first attempt that has seriously been made to bring the relation of husband and wife within the prohibition of this clause of the constitution respecting contracts, while it cannot be denied, on the other hand, that all of the obligations growing out of this relation, have in repeated instances been wholly annulled by special laws passed by the Legislatures of the different states granting divorces to the parties. In many of the states of the Union there is no judicial remedy by one party against the other, for a breach of the obligations of the marriage relation. The only remedy being by divorce, which is granted by the Legislature alone. This is the case in several of the states at the present time, and I am not aware that the legislative power of a state, thus wholly to annul the marriage relation, has ever been seriously questioned. It is a power which has been exercised by most, if not by all the states of the Union. And it was adjudged in the case of *Starr* v. *Pease*, (8 Conn.

R. 5, 41,) that a legislative divorce, *a vinculo*, for cause, such as a breach of the marriage obligations, was constitutional and valid, and such is the opinion of Chancellor Kent in his Commentaries, (2d Kent's Com. 107, 3d ed.) And the opinion of Chief Justice Marshall in the case of *Dartmouth College* v. *Woodworth*, is to the effect that a general law regulating divorces for cause, is within the province of state legislation, and such is the opinion of Justice Story. He says, in that case, that a general law regulating divorces, was not necessarily a law impairing the obligations of such a contract; and that a law punishing the breach of a contract by imposing a forfeiture of the rights acquired under it, or absolving it, because the marital obligations were no longer observed, was not a law impairing the obligation of contracts, while at the same time he declared that he was not prepared to admit a power in the state Legislature to dissolve the marriage contract without any cause or default, and against the wishes of the parties, and without a judicial inquiry to ascertain the breach of the contract. It cannot be denied that while the marriage relation is said to be a civil contract between the parties, it is not a contract in the full common law sense of the term. It is from the Romans, from whence we have derived the civil law, that the idea has prevailed that marriage was a civil contract. It was, however, with them a contract without much of an obligation, as the continuance of the relation depended almost wholly upon the caprice of one or the other of the parties. (2d Kent's Com. 85, 3d ed.; Notes to Cooper's Justinian, 437, 438.) Marriage is a civil institution established for great public objects. It is defined to be a contract between a man and a woman for the procreation and education of children. (Bacon's Abr., tit. Baron and Feme, letter A.) And it has a similar definition in the civil law. (Cooper's Justinian, 419.) It is wanting in many of the essential ingredients of a contract, and is regulated more upon grounds of public policy to accomplish the great objects of such a relation, than it is with reference to the pecuniary rights of the parties as it regards each other; unlike other contracts at the common law, the parties may enter into it, the male at the age of 14 and the female at the age of 12 years. It cannot, like ordinary contracts, be dissolved by mutual agreement, or cancelled upon a valuable consideration. Neither can its obligations be modified by the parties. The will of society and public policy supersedes the will of the parties; and, however unable one of the parties may subsequently become to perform the obligations resulting from the relation, the other is still bound. Not even a total overthrow of all the mental powers, terminating in fixed and permanent insanity, is permitted to operate as a discharge of the other party

from its obligations.    And the very creation of this relation dissolves all previous contracts between the parties, and produces a total incapacity to enter into other contracts between themselves.    In fact, almost the only essential features of a contract it possesses, is, that the assent of the parties is necessary to create the relation, and it can not be alleged that the mere consent of the parties to establish a certain relation in society between them, necessarily makes the transaction between them a contract.    If this were so, the relation of guardian and ward, whenever the ward chooses the guardian, would be the result of a contract, and consequently, beyond the control of state legislation.    Without further consideration of this branch of the case, I will conclude by saying, that in my opinion, the marriage relation is not created by what we understand to be a contract in the strict common law sense of that term, and is not in what popular language and common parlance, we understand by the word contract; and it is not a contract within the spirit and meaning of this prohibitory clause of the Constitution of the United States.    It follows, therefore, that there is nothing in the Constitution of the United States which invalidates the statute under consideration, for there is nothing in that which prohibits a state Legislature from taking away vested rights, unless they arise out of contract.    This was expressly adjudged in the case of *Watson* v. *Mercer*, 8 Peters' R. 88.

The next question which I propose to consider, is, does the statute under consideration violate the first section of article one of the constitution of this state, which is as follows : " No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." The defendant in this suit, by virtue of the marriage contract with the plaintiff, became seized of a freehold estate in this farm.    He not only succeeded to rights of property, but became actually seized of the freehold, *jure uxoris*, and entitled to take the rents and profits, during their joint lives in any event, and as there were children born alive of the marriage, he took an absolute freehold estate for life as tenant by the courtesy. (2 Kent's Com. 130, 131, 2d ed. ;  *Adair and others* v. *Scott*, 3 Hill R. 182.) This section, one of article one, of the present constitution, is but a copy of section one of article seven of the former constitution of the state, and has received judicial construction.    The question arose in the case of *Taylor* v. *Porter & Ford*, (4 Hill R. 140,) as to the validity of a general statute of the state authorizing private roads to be laid out over the lands of the owners thereof, for the use of the applicant, his heirs and assigns, and the act of the Legislature was judged to be unconstitutional, as coming

in conflict with this section of the constitution. And we must regard this section of the constitution as having received judicial construction : "No member of this state shall be disfranchised or deprived of any of the rights and privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." The court in the case of *Taylor* v. *Porter & Ford*, in considering the expression " by the law of the land," contained in this section, use the following language : " The words *by the law of the land*, as here used, do not mean a statute passed for the purpose of working the wrong ; that construction would render the restriction absolutely nugatory and turn this part of the constitution into mere nonsense. The people would be made to say to the two houses, you shall be vested with the legislative power of the state, but no one shall be disfranchised or deprived of any of the rights or privileges of a citizen, unless you pass a statute for that purpose ; in other words you shall not do wrong unless you choose to do it." Again, says the court in that case, " the meaning of the section then seems to be, that no member of this state shall be disfranchised or deprived of any of his rights or privileges, unless the matter shall be adjudged against him upon trial had according to the course of the common law. It must be ascertained judicially that he has forfeited his privileges, that some one else has a superior title to the property he possesses before either of them can be taken from him. It can not be done by mere legislation." The same principle was adjudged at an earlier day in the matter of *Albany Street*, 11 W. R. 149. This principle is again recognized in the case of *Bloodgood* v. *M. and H. Railroad Company*, 18 W. R. 9. But again it seems to me that this act of the Legislature must be adjudged void as contravening the 6th section of article one of the constitution of this state, which is as follows : " No person shall be subject to be twice put in jeopardy for the same offence, nor shall he be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation." (Art. 1st, sec. 6th, Const.) This is an exact copy of a part of the 7th section of article 7, of the former constitution of this state, and the expression " nor be deprived of life, liberty, or property, without due process of law," received judicial construction in the case of *Taylor* v. *Porter & Ford, supra*, and the court in commenting upon this part of the section say, " the words due process of law in this place can not mean less than a prosecution or suit instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining the title to property. It will be seen that the same measure of protection

against legislative encroachment is extended to life, liberty and property, and if the latter can be taken without a forensic trial and judgment there is no security for others. If the Legislature can take the property of A, and transfer it to B, they can take A, himself, and either shut him up in prison or put him to death. But none of these things can be done by mere legislation; there must be " due process of law." These same provisions of the present constitution were again considered by this court in the case of *Gilbert* v. *Foote*, in which case the court declared the statute entitled " of proceedings for the draining of swamps, marshes, and other low lands," (2 R. S. 548,) unconstitutional. The case went to the Court of Appeals and was affirmed by default in that court at the last January term thereof—the court deciding that as the statute authorized the taking of the property of the owner of the land and transferring it to the applicant, his heirs and assigns, for the ditch, against the consent of the owner, it was in conflict with the provisions of the constitution above referred to, and consequently void. This case has not as yet been reported. I think that Senator Tracy was right in the case of *Bloodgood* against *The Mohawk & Hudson Railroad Company*, 18 W. R. 59, when he said that the latter clause of the section of the former constitution, "nor shall private property be taken for public use without just compensation, as equivalent to a constitutional declaration that private property without the consent of the owner shall be taken only for the public use, and then upon a just compensation." The decision of this case was made in 1837, and the case of *Taylor* v. *Porter & Ford*, 4 Hill's R. 440, was decided in 1843, in which this general statute of the state was declared to be an infraction of this provision of the constitution; and the principle decided in these cases was well understood by the framers of the present constitution, and they must have appreciated the full force of the decision in the latter case, and have provided by section 7, article 1, of the present constitution, that so far as private roads are concerned they may be opened in the manner to be prescribed by law, but have not extended the right to take private property for private use beyond the case of opening private roads and from the very fact that they have not, I think the inference is irresistible that they did not intend it should be done. But again, I am not prepared to admit that the Legislature of a state possesses any such power as would authorize them to take the property of one person and give it to another against the consent of the owner, were there no such prohibitions contained in the constitution. It has been said that the British Parliament was omnipotent, but the great commentator upon the Laws of England seems to think that when they speak of the omnipotence of Parliament

they use a figure of speech rather too bold. (1 Black. Com. 161.) But this omnipotence of Parliament signified nothing more than the supreme sovereign power of the State, and I think, therefore, that De Lolme made an unwarrantable assertion when he said that "it is a fundamental principle with the English lawyers that Parliament can do every thing but make a woman a man and a man a woman." The Legislature, however, is not supreme under our form of government. It is only one of the organs of the absolute sovereignty which resides in the whole body of the people. (4 Hill's R. 144.) It was said by the late Justice Story, in the case of *Wilkinson* v. *Leland et al.*, 2 Peters' R. 657, "that a government can scarcely be deemed to be free when the rights of property are left solely dependent on the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred." Again, he says, "we know of no case in which a legislative act to transfer the property of A. to B., without his consent, has ever been held a constitutional exercise of legislative power in any state of the Union. On the contrary, it has constantly been resisted, as inconsistent with first principles, by every judicial tribunal in which it has been attempted to be enforced." I maintain, therefore, that the security of the citizen against such arbitrary legislation rests upon the broader and more solid ground of natural rights, and is not wholly dependent upon these negatives upon the legislative power contained in the constitution. It can never be admitted as a just attribute of sovereignty in a government to take the property of one subject and bestow it upon another. The exercise of such a power is incompatible with the nature and objects of all governments, and is destructive to the great end and aim for which government is instituted, and is subversive of the fundamental principles upon which all free governments are organized. This was a power repudiated by the Romans during the whole reign of imperial despotism, and has ever been a maxim of the civil law, and was asserted in England as one of the sovereign rights of the citizen, and forms a part of the 29th chapter of Magna Charta. And I do not hesitate, in conclusion, to declare that the people of the state of New York have never delegated to their Legislature the power to divest the vested rights of property, legally acquired by any citizen of the State, and transfer them to another against the will of the owner. The Legislature of this State can only lawfully exercise such powers as have been confided to it by the sovereign will of the people, and when it usurps powers not entrusted to it by the sovereign power, its acts are as utterly void as those of the most inferior magistrate in the land,

in case where he has transcended his jurisdiction. It follows, therefore, that this act of the Legislature under which the plaintiff has sought the relief claimed in this case is void, and, consequently, can confer no rights upon her. I have not, in declaring the deliberate judgment which I entertain in this case, been unmindful of the importance and delicacy of the duties devolving upon this court. We are called upon to declare an important statute of the State unconstitutional and void; a statute deeply affecting the most important and delicate of the marital rights; a statute, it is said, passed to repeal the common law and substitute the civil in its stead; a law called for, it is alleged, by the popular voice of the State, and demanded by the onward progress of society. In a case like this, the court can never find a motive to transcend its duty, and I trust it will always be found to possess independence enough to do that. The defendant must have judgment upon the demurrer in this cause.